[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-11064

_____

GENERAL STAR NATIONAL INSURANCE COMPANY,

Plaintiff-Appellant,

*versus*

MDLV LLC,
d.b.a. One Sotheby's International Realty,
HELIAC, INC.,
GLEB KLIONER,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

D.C. Docket No. 1:21-cv-24284-FAM

————————————

Before ROSENBAUM, NEWSOM, and LUCK, Circuit Judges.

PER CURIAM:

This duty-to-defend action arises from an underlying lawsuit involving a real-estate transaction. Heliac, Inc., a real-estate holding company, owned a condominium property in South Florida. It enlisted MDLV, LLC, d/b/a One Sotheby's International Realty ("One Sotheby's") and its agent Gleb Klioner to help it sell the property. Heliac sued One Sotheby's and Klioner. It alleged that Klioner made misrepresentations to induce Heliac to sell its property so Klioner could earn a commission and that he later converted the sale proceeds for his own use.

One Sotheby's, insured by General Star National Insurance Company, sought coverage for its defense against the Heliac lawsuit. In the action before us, General Star sought a declaratory judgment that various exceptions in One Sotheby's insurance policy preclude coverage. Two of those exceptions are at issue on appeal: the conversion exclusion (which precludes coverage for claims arising out of any disputes involving conversion) and the future-value exclusion (which precludes coverage for claims arising out of any guarantee or promise of future status, performance, or valuation).

Florida law requires General Star to defend One Sotheby's in the Heliac action if any of Heliac's claims, as alleged, fall partially

or potentially within the scope of the policy's coverage and outside an exception. The district court concluded that at least two counts in the Heliac lawsuit come within One Sotheby's policy's coverage and lie outside the two exceptions at issue on appeal. We agree. Therefore, we affirm the district court's decision.

## I.

General Star issued a Real Estate Errors and Omissions Liability Insurance Policy to One Sotheby's, effective from November 30, 2020, through November 30, 2021 (the "Policy"). The Policy provides professional liability coverage for the real-estate brokerage as follows:

> The Company will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as Damages for Claims first made against the Insured during the Policy Period and first reported to the Company in writing during the Policy Period or applicable Extended Reporting Period, arising out of any act, error, omission or Personal Injury in the rendering of or failure to render Professional Services by an Insured[.]

But the Policy also contains several exclusions, including, as relevant here, one for damages arising out of disputes involving conversion and one for damages arising from guarantees or promises of future performance or valuation:

> The Company has no obligation under this Policy to pay Damages or Claims Expenses or to provide a defense, in connection with any Claim(s):

A. Under any part of this Policy if based on or arising out of the following: . . .

>    2. Any disputes involving any Insured's fees, commissions or charges, the failure to pay or collect premium, escrow or tax money, or the conversion, misappropriation, commingling or embezzlement of funds or other property. However, in the event a Claim is made against an Insured seeking both the return of escrow money and alleging an act, error, omission or Personal Injury in the performance of Professional Services covered under this Policy, the Company will defend such Claim without any obligation to reimburse the Insured for the payment of monies held as escrow: . . .

>    16. Any guarantee or promise of future status, performance or valuation in the course of performing Professional Services by the Insured.

Heliac filed a lawsuit against One Sotheby's and Klioner for actions they allegedly undertook or omitted while the Policy was in effect. In its relevant pleading, Heliac alleged that the following actions took place. Heliac was a real-estate holding company whose only principals were two Russian citizens who reside in Russia. Heliac bought a condominium at 9701 Collins Avenue, Unit 502S, Bal Harbour, Florida, in the St. Regis building. To manage their property, Heliac retained Gleb Klioner, a real-estate agent well-known in South Florida's Russian-speaking community. To

facilitate his management of the condominium, Heliac gave Klioner access to Heliac's operating account.

Later, One Sotheby's hired Klioner. Once Klioner worked for One Sotheby's, Heliac entered into a listing agreement with One Sotheby's. Under that agreement, One Sotheby's listed the condominium for almost six-million dollars. Nothing relevant to this case happened for some time after that.

But according to Heliac's allegations, several years later, between December 2020 and February 2021, Klioner "continuously advised" Heliac to sell the condominium "immediately" because of what Klioner described the relevant market conditions to be. More specifically, Klioner made these statements to Heliac:

- The real estate market in Miami Beach, Florida, was on the verge of crashing;
- The drop in the condominium's value by as much as 60 to 70% was imminent;
- It would be nearly impossible to sell the condominium beyond mid-March 2021;
- The U.S. economy was on the verge of crashing at any moment;
- The U.S. stock market was on the verge of crashing at any moment;
- Heliac had to sell the condominium urgently, or it would lose money because it would become unable to sell the property.

Heliac alleges that Klioner made these statements "while having superior knowledge of the real estate market," and knowing that

Heliac's principals were generally underinformed about the real-estate market in this country.

In December 2020, Klioner presented Heliac with a $3.8 million offer on the condominium. But that offer fell "significantly" below the unit's list price and, as Heliac alleged, below market price as well. So despite pressure from Klioner, Heliac refused to sell for $3.8 million.

Heliac asserts that after it declined to sell, on January 27, 2021, Klioner converted $20,000 from Heliac's operating account to his personal account. This was the first time Klioner allegedly converted Heliac's funds.

The next month, in February 2021, Klioner presented another offer for the condominium to Heliac, this time for $4.2 million. This offer still fell below the price Heliac wanted to accept for the unit. But after enduring what it characterized as "merciless[]" pressure from Klioner for over two months, Heliac's principals acquiesced to the sale on February 8, 2021.

From that date, Heliac instructed Klioner to deposit the proceeds into its bank account in Switzerland. But Klioner said that he could only deposit the proceeds into Heliac's operating account in Florida, which only Klioner could access in person. Klioner also advised that the sale could be completed in a timely matter only if Heliac executed a corporate resolution granting him full authority to sign all closing documents on Heliac's behalf. Klioner never informed Heliac that the closing documents could be executed through an online notary.

Heliac went through with the sale on March 10, 2021. In reliance on Klioner's disbursement instructions, Heliac arranged for $3,885,023.02 to be wired from the closing agent's escrow account into Heliac's operating account. A week later, on March 17, 2021, Heliac alleged, Klioner secretly wired nearly all the proceeds—$3,734,277.21—from Heliac's operating account to his personal account without Heliac's knowledge or permission. This was the second time Klioner allegedly converted Heliac's funds.

About nine days after that, on March 26, 2021, Heliac provided Klioner with wire-transfer instructions to send the condominium sale proceeds to Heliac's principals' account at the Swiss bank. Klioner did not do so. Instead, for the next two-and-a-half months—until June 7, 2021, Klioner gave Heliac's principals various false reasons for the bank's inability or refusal to approve the transfer of the sale proceeds. Eventually, though, Klioner admitted to Heliac that he had converted the sale proceeds for his own use. Klioner still has not returned the converted proceeds.

Heliac's First Amended Complaint asserted five counts against One Sotheby's, two of which are relevant on appeal: negligent misrepresentation (Count I) and negligent employee training (Count III). In Count I, Heliac alleged that Klioner apparently believed the alleged misrepresentations of material fact he made to Heliac about the then-current state of the real-estate market were true, even though he and One Sotheby's "should have known" they were false. According to the complaint, One Sotheby's and Klioner "intended and expected Heliac to rely on Klioner's

misrepresentations to induce Heliac to sell the St. Regis Condo and, consequently, collect a commission from the sale of the St. Regis Condo as soon as possible." Count I sought to recover the converted sale proceeds and the difference between the market price of the condominium and its actual sale price ("market-value damages"). This Count did not seek any damages related to the first alleged conversion.

Count III alleged that One Sotheby's owed Heliac a duty to adequately train its associates and that it breached this duty. In Heliac's view, this duty included ensuring that associates like Klioner properly advised clients of market value and market conditions, refrained from pressuring clients, informed clients of applicable closing procedures, followed client instructions, and did not "overstep" by taking unauthorized action in real-estate transactions. Heliac asserted that Klioner's handling of the condominium sale made it "evident" that One Sotheby's had failed to adequately train him in these alleged obligations. As a direct result of One Sotheby's failure to train Klioner, Heliac said, it suffered market-value damages "and the loss of the St. Regis Condo sale proceeds." Like Count I, Count III did not seek recovery of the first set of funds converted.

General Star initially denied coverage for the Heliac lawsuit. But later, it agreed to defend One Sotheby's under a reservation of rights. After that agreement, General Star filed this coverage action seeking a declaration that it owed no duty to defend or indemnify One Sotheby's in the Heliac litigation.

In response, One Sotheby's filed a motion for judgment on the pleadings in this action.  The district court adopted the magistrate judge's report and recommendation agreeing with One Sotheby's that Counts I and III of the Heliac complaint fell within the Policy's scope of coverage and outside the exclusions.  *Gen. Star Nat'l Ins. Co. v. MDLV, LLC*, No. 21-24284-CIV, 2023 WL 2436148, at *1 (S.D. Fla. Jan. 5, 2023), *R&R adopted*, No. 21-24284-CIV, 2023 WL 2388518 (S.D. Fla. Feb. 3, 2023).  As to the conversion exclusion, the court concluded that the complaint could be fairly read to allege that Klioner did not decide to convert the sale proceeds until after the sale had already occurred.  *Id.* at *5.  So, the court reasoned, "the preceding actions—and the damages caused by the market differences—could not have *arisen from* the conversion[,]" and the counts did not fall under the conversion exception to coverage.  *Id.* at *5.  As to the future-value exclusion, the court construed the plain meanings of "guarantee" and "promise" narrowly and reasoned that the allegations in the complaint did not come "solely and entirely within the policy exclusion."  *Id.* at *6.

For its part, General Star filed a motion for partial summary judgment on issues identical to those in One Sotheby's motion for judgment on the pleadings.  Again adopting the magistrate judge's separate report and recommendation, the district court denied General Star's motion.  *Gen. Star Nat'l Ins. Co. v. MDLV, LLC*, No. 21-24284-CIV, 2023 WL 449385, at *1 (S.D. Fla. Jan. 10, 2023), *R&R adopted*, No. 21-24284-CIV, 2023 WL 418873 (S.D. Fla. Jan. 26, 2023). It explained that it had already decided the issues General Star raised in One Sotheby's motion for judgment on the pleadings,

applying a standard of review that was more favorable to General Star than the one applicable under General Star's motion for partial summary judgment. *Id.*

The district court later entered final judgment, declaring that General Star had a duty to defend One Sotheby's in the Heliac lawsuit for claims against One Sotheby's.[1]

## II.

We review *de novo* an order granting judgment on the pleadings. *Perez v. Wells Fargo Nat'l Ass'n*, 774 F.3d 1329, 1335 (11th Cir. 2014). Judgment on the pleadings should be granted when no material facts are in dispute "and the moving party is entitled to judgment as a matter of law." *Cannon v. City of W. Palm Beach*, 250 F.3d 1299, 1301 (11th Cir. 2001). In assessing a motion for judgment on the pleadings, we accept as true all material facts that the non-moving party's pleading alleges, and we view those facts in the light most favorable to the non-moving party. *Perez*, 774 F.3d at 1335.

We review *de novo* the interpretation of an insurance contract. *Chalfonte Condo. Apartment Ass'n Inc. v. QBE Ins. Corp.*, 561 F.3d 1267, 1274 (11th Cir. 2009). Because this action arises under our diversity jurisdiction and the Policy was delivered to One Sotheby's in Florida, substantive Florida law governs our interpretation of the insurance contract. *Fioretti v. Massachusetts Gen. Life Ins. Co.*, 53 F.3d

---

[1] As for Heliac's claims against Klioner, the district court entered default judgment for General Star against Klioner for failure to answer or otherwise plead to the summons and complaint that General Star served on him.

1228, 1235 (11th Cir. 1995) (explaining that Florida follows the doctrine of *lex loci contractus*, which, in the absence of a choice-of-law provision in the contract, directs the court to follow the law of the state in which the contract was made).

Florida has several rules we must apply in determining whether the Policy provides any coverage for Sotheby's One. We set them forth below.

Under Florida law, "the duty to defend is broader than the issue of coverage." *Mid-Continent Cas. Co. v. Royal Crane, LLC*, 169 So. 3d 174, 180 (Fla. Dist. Ct. App. 2015). Florida applies the "eight corners" rule, looking only to the underlying complaint for which coverage is sought and the policy when deciding whether a duty to defend exists. *Travelers Indem. Co. of Conn. v. Richard Mckenzie & Sons, Inc.*, 10 F.4th 1255, 1261 (11th Cir. 2021). When a complaint, fairly read, "alleges facts that are partially within and partially outside the coverage of an insured's policy," the insurer must defend that entire suit. *Sunshine Birds & Supplies, Inc. v. U.S. Fid. & Guar. Co.*, 696 So. 2d 907, 910 (Fla. Dist. Ct. App. 1997). And "[i]f the allegations of the complaint leave any doubt as to the duty to defend," we must resolve that doubt in the insured's favor. *Mid-Continent Cas. Co.*, 169 So. 3d at 181 (citing *Lime Tree Vill. Cmty. Club Ass'n v. State Farm Gen. Ins. Co.*, 980 F.2d 1402, 1405 (11th Cir.1993)).

When, as here, an insurer relies on an exclusion to deny coverage, the insurer bears the burden to show that the complaint's allegations fall "solely and entirely within the policy exclusion and are subject to no other reasonable interpretation." *Deshazior v.*

*Safepoint Ins. Co.*, 305 So. 3d 752, 755 (Fla. Dist. Ct. App. 2020). If a policy's text is "plain and unambiguous," we must give that language "the meaning it clearly expresses." *N. Pointe Cas. Ins. Co. v. M & S Tractor Servs., Inc.*, 62 So. 3d 1281, 1282 (Fla. Dist. Ct. App. 2011) (citation omitted). But if an exclusionary provision is "ambiguous or otherwise susceptible to more than one meaning," we construe that provision in the insured's favor because, generally, the insurer drafts the policy. *Mid-Continent Cas. Co.*, 169 So. 3d at 182.

**A.**

With these standards and rules of construction in mind, we turn to the Policy. We begin by noting that the parties do not dispute that, without consideration of the Policy's exceptions, Heliac's allegations are subject to coverage under the Policy. That is, Heliac's allegations involve "Damages for Claims first made against the Insured during the Policy Period . . . arising out of any act . . . in the rendering of or failure to render Professional Services by an Insured[,]" subject to the parties' disputes about applicable exceptions.

We therefore consider whether the conversion exclusion removes Heliac's allegations from coverage. The relevant provision states that General Star has no obligation "to pay Damages or Claims Expenses or to provide a defense in connection with any Claim(s)[] [u]nder any part of this Policy if based on or arising out of . . . [a]ny disputes involving any Insured's . . . conversion . . . of funds[.]" (Emphasis omitted from original). Although the district court described this language as "written broadly," it concluded

that the Heliac lawsuit could be fairly read to allege that Klioner did not decide to convert the funds until after the sale of the condominium. *Gen. Star Nat'l Ins. Co.*, 2023 WL 2436148, at *4–5. Under that interpretation, the court said, Klioner's actions through the time of sale "could not have *arisen from* the conversion." General Star argues that in reaching this conclusion, the district court ignored the word "involving" in the conversion exclusion's text; because part of the lawsuit "involve[es]" conversion, Heliac's claims are excluded from policy coverage.

We disagree. As we've mentioned, under Florida law, we construe insurance contracts in accordance with their "plain meaning." *Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So. 2d 528, 532 (Fla. 2005). And to be sure, Florida courts have broadly interpreted language like "arising out of," "based on," and "involving." *Id.* at 539–40 (interpreting "arising out of" as "originating from," "having its origin in," growing out of," "flowing from," incident to," or "having connection with"); *Houston Specialty Ins. Co. v. Fenstersheib*, 632 F. Supp. 3d 1318, 1332 (S.D. Fla. 2022) (finding that "based on" "fit[s] snugly" with the definition of "arising out of"); *State v. Elder*, 975 So. 2d 481, 483 (Fla. Dist. Ct. App. 2007) (defining "involve" as "to draw in as a participant," to "implicate," "to relate closely," to "connect," "to have an effect on," to "concern directly," to "affect").

But even when we read the term "involving" broadly, it must be read in tandem with the phrase "arising from." As a result, we cannot say that the claims in Counts I and III necessarily

"originat[ed] from," "gr[e]w out of," or "flow[ed] from" a dispute "connect[ed]" to conversion. The complaint can be fairly read to allege that Klioner negligently made the misrepresentations at the root of each claim for the purpose of inducing a sale and earning a commission, not as part and parcel of a conversion scheme. So a jury could find One Sotheby's liable for market-value damages related to Klioner's negligent misrepresentations and One Sotheby's negligent training of Klioner, without also necessarily also finding it liable for conversion and the lost sale-proceeds damages.

And that is the whole ballgame. Because a jury could hold One Sotheby's liable without also finding conversion, the claims at issue in this case do not necessarily "aris[e] from" a dispute "involving" conversion, and General Star has a duty to defend.

To hold otherwise would unravel Florida's jurisprudence requiring coverage for the insured when a complaint even *partially* falls under coverage and outside of exclusions. *Sunshine Birds & Supplies, Inc.*, 696 So. 2d at 910. Florida law commands that we parse a single lawsuit for different bases of liability, so "[i]f the facts alleged show *any* basis for imposing liability upon the insured that falls within policy coverage, the insurer has a duty to defend." *Lime Tree Vill. Cmty. Club Ass'n, Inc.*, 980 F.2d at 1405–06 (emphasis added) (finding a duty to defend where the complaint "set forth grounds," other than intentional acts excluded from policy coverage, "upon which Lime Tree could be held liable").

And when a complaint alleges multiple causes of action and multiple types of damages, with some based on acts that the policy

does not exclude, we must parse each basis of liability separately. *Id.* at 1405 (distinguishing "a single cause of action based wholly on acts expressly excluded by the policy" from a complaint setting forth multiple grounds for liability).  Therefore, we consider whether each basis of liability, rather than the lawsuit as a whole, is "based on or arising out of . . . [a]ny disputes involving . . . conversion."  And if a basis exists for establishing liability that does not involve conversion at all, General Star has a duty to defend.

Before we delve into the allegations of the Heliac complaint to show why it alleges a dispute that does not "involv[e]" conversion, we pause briefly to discuss the meaning of "dispute" in the Policy.  The Policy does not expressly define the term. Still, though, its terms otherwise inform the meaning of the word.

We start with the ordinary meaning of the term "dispute." *Deutsch v. Geico Gen. Ins. Co.*, 284 So. 3d 1074, 1076 (Fla. Dist. Ct. App. 2019) ("When a term in an insurance policy is undefined, it should be given its plain and ordinary meaning, and courts may look to legal and non-legal dictionary definitions to determine such a meaning.").  *Black's Law Dictionary* defines "dispute" to mean "[a] conflict or controversy, esp. one that has given rise to a particular lawsuit." (11th ed. 2019).  Here, as we've noted, the conversion exclusion relieves General Star of the "obligation under this Policy to pay Damages or Claims Expenses or to provide a defense, in connection with any Claim(s) . . . [u]nder any part of this Policy if based     on     or     arising     out     of . . . [a]ny ***disputes***

involving . . . conversion . . . ." (Emphasis added). That is, the Policy employs the plural of "dispute"—"disputes."

We think that has significance. First, a lawsuit is not necessarily a single "dispute." Rather, it can involve multiple "disputes," meaning multiple "conflict[s] or controvers[ies]." Because that is so, that one particular "dispute" within a lawsuit "involv[es]" conversion does not necessarily mean that all "disputes" within the case necessarily "involv[e]" conversion. And that is precisely the case here.

Counts I and III allege facts and seek damages that do not necessarily arise from any dispute involving conversion. Count I expressly avers that One Sotheby's and Klioner, "as its sales associate, intended and expected Heliac to rely on Klioner's misrepresentations to induce Heliac to sell the St. Regis Condo and, *consequently, collect a commission from the sale of the St. Regis Condo as soon as possible*." (Emphasis added). One fair reading of the complaint alleges that Klioner made the misrepresentations to secure a commission, not to further a conversion scheme. True, Count I also asserts at a different point that without the sale, "Heliac's funds could not have been converted." But these allegations can be fairly read to suggest that the dispute involving the conversion of the sale proceeds "ar[ose] out of" Klioner's misrepresentations made in an effort to procure a commission, not the other way around.

Count III turns to the misrepresentations as evidence of a failure to train Klioner, but it similarly flows from a theory of negligence and Klioner's desire to earn a commission, not for the

23-11064                Opinion of the Court                17

purpose of furthering a conversion scheme.  *See Mactown, Inc. v. Cont'l Ins. Co.*, 716 So. 2d 289, 291 (Fla. Dist. Ct. App. 1998) (finding that a negligent retention claim did not fall under a coverage exclusion for battery where the plaintiffs in the underlying suit brought claims for respondeat superior liability for battery and negligent retention).

Heliac, the master of its complaint, could have alleged that Klioner made the misrepresentations with the goal of persuading Heliac to sell so that he could eventually convert the funds, but it did not.  *Hill v. BellSouth Telecomms., Inc.*, 364 F.3d 1308, 1314 (11th Cir. 2004).  Rather, Heliac set out distinct grounds for liability in its complaint: negligence (negligent misrepresentations and negligent employee training) and intentional acts (conversion).  *Lime Tree Vill. Cmty. Club Ass'n, Inc.*, 980 F.2d at 1405.  And negligent misrepresentations made for the purpose of securing a quick commission and the resulting market-value damages are not merely incidental to a conversion that happened post-sale.  *Guideone Elite Ins. Co. v. Old Cutler Presbyterian Church, Inc.*, 420 F.3d 1317, 1328 (11th Cir. 2005) (finding it "difficult to categorize a multi-crime episode, which included a kidnapping, an assault and battery, and a robbery, as simply incident to a rape," which was excluded from coverage).  Nor can we say that the negligent acts would not have occurred "but for" the conversion, because the negligent misrepresentations were motivated by the desire to secure a commission, not enable conversion.  *Id.*

Whether One Sotheby's is eventually found liable under a negligence or conversion scheme theory does not matter to whether General Star as a duty to defend under the Policy: "[T]he duty to defend arises even where 'there has been a suggestion made that the purported negligent allegations are really allegations of intentional acts in disguise.'" *Hartford Acc. & Indem. Co. v. Beaver*, 466 F.3d 1289, 1297 (11th Cir. 2006). "[S]o long as the complaint can reasonably be read as alleging that the [plaintiffs'] injuries were negligently caused, even if it also may arguably be read as alleging that the injuries were intentionally caused, the doubt must be resolved in favor of finding a duty to defend." *Id.* Here, as we've explained, should Heliac's complaint proceed to trial, a jury could find One Sotheby's liable for negligent misrepresentation and negligent training, and not conversion. As a result, the negligent-misrepresentation and negligent-training claims do not necessarily arise from a dispute involving conversion.

The damages alleged are also distinct: the market-value damages and the lost-sale proceeds. General Star argues that the market-value damages are necessarily connected to conversion. Again, we disagree. Counts I and III allege that as a result of Klioner's misrepresentations and One Sotheby's failure to adequately train Klioner, Heliac was damaged to the extent of *"the difference between the market price of the St. Regis Condo and its sale price*, and the loss of the St. Regis Condo sale proceeds." (Emphasis added). As we've noted, though, the complaint ties the market-value damages to Klioner's alleged misrepresentations that Heliac said induced it to sell its condominium for significantly less than it

was worth.  And that brings us back to the purpose Heliac alleges for Klioner's alleged misrepresentations: to secure a commission.

So the market-value damages Heliac sought did not "arise out of" the conversion, but rather, out of the allegedly pressured sale of the condominium, which, in turn, Heliac asserts resulted from Klioner's desire to earn a commission.  And while General Star may suggest that market-value damages are a novel theory of recovery, we must resolve any uncertainty about coverage in favor of One Sotheby's.  *Carithers v. Mid-Continent Cas. Co.*, 782 F.3d 1240, 1246 (11th Cir. 2015) (holding that the insurer "was required to offer a defense in the underlying action unless it was certain that there was no coverage for the damages sought" where there was an unresolved split amongst courts as to whether the underlying theory for damages was viable).  Where a jury could find One Sotheby's liable for negligent misrepresentation and negligent training but not conversion, it could also make One Sotheby's pay the market-value damages but not the lost sale-proceeds damages.  Under the Policy, then, One Sotheby's could be made to pay the market-value damages because they are not "in connection" with a claim "arising out of . . . [a]ny dispute involving" conversion.

In short, Florida law commands us to consider whether "the facts alleged show *any* basis for imposing liability upon the insured that falls within policy coverage."  *Lime Tree Vill. Cmty. Club Ass'n, Inc.*, 980 F.2d at 1406 (emphasis added).  When we find such basis, "the insurer has a duty to defend."  *Id.*  Here, it's true that conversion certainly "punctuates" the allegations in the Heliac complaint.

But "it [i]s but one of the many" injuries (such as market-value damages) Heliac's complaint alleges. *Guideone Elite Ins. Co.*, 420 F.3d at 1328. A jury could find One Sotheby's guilty of negligent misrepresentation and negligent training while also finding that no conversion occurred. That theory of liability would involve no conversion whatsoever, in the claims or the market-value damages paid on those claims. As a result, at least one basis for liability—negligent misrepresentation or negligent training, and the resulting market-value damages—exists that does not arise out of a dispute involving conversion. Because Counts I and III can fairly be read to at least partially fall under coverage and outside of exceptions, the conversion exception does not absolve General Star of its duty to defend One Sotheby's from the Heliac Lawsuit.[2]

**B.**

The future-value exclusion similarly fails to apply to at least some of the allegations in the Heliac complaint, so it also does not relieve General Star of the duty to defend.

We again begin with the text of the exclusion. The future-value exclusion bars coverage for claims "based on or arising out of . . . [a]ny guarantee or promise of future status, performance or valuation in the course of performing Professional Services by the

---

[2] General Star has forfeited its argument, raised for the first time in its reply brief on appeal, that the Policy's exclusion for damages that arise out of "[a]ny disputes involving any Insured's fees, commissions or charges" also precludes coverage for the market-value damages. *United States v. Whitesell*, 314 F.3d 1251, 1256 (11th Cir. 2002).

Insured." The Policy does not define "Guarantee" and "promise," so we give the words their "plain and ordinary meaning" by looking to legal and nonlegal dictionary definitions. *Deutsch*, 284 So. 3d at 1076.

"Promise" and "guarantee" have varying definitions. But both terms suggest that the speaker binds herself to some future action or responsibility. *Merriam Webster's* defines "promise" as "a declaration that one will do or refrain from doing something specified," or "a legally binding declaration that gives the person to whom it is made a right to expect or to claim the performance or forbearance of a specified act." *Promise*, MERRIAM-WEBSTER'S ONLINE DICTIONARY (last visited Feb. 7, 2024), https://www.merriam-webster.com/dictionary/promise [https://perma.cc/Z48N-V4QJ]; *Gen. Star Nat'l Ins. Co.*, 2023 WL 2436148, at *6 (giving additional definitions for promise: "reason to expect something;" "to pledge to do, bring about, or provide"; "warrant, assure"; or "to give ground for expectation.").

Reasonable definitions of "guarantee" also evoke the imposition of an obligation, conditional on some future happening or nonhappening. *Guarantee*, MERRIAM-WEBSTER'S ONLINE DICTIONARY, (last visited Feb. 7, 2024), https://www.merriam-webster.com/dictionary/guarantee [https://perma.cc/GZ9A-N25B] (defining "guarantee" as "an assurance for the fulfillment of a condition" such as securing another's possession or assuring the quality or length of use of a product with a promise of reimbursement); *Gen. Star Nat'l Ins. Co.*, 2023 WL 2436148, at *6 (citing the

same definition); *see also condition*, MERRIAM-WEBSTER'S ONLINE DICTIONARY (last visited Feb. 7, 2024), https://www.merriam-webster.com/dictionary/condition [https://perma.cc/VV9F-6CEF] (defining "condition" as "a premise upon which the fulfillment of an agreement depends[,]" "a provision making the effect of a legal instrument contingent upon an uncertain event[,]" and "something essential to the appearance or occurrence of something else[,]" such as a prerequisite).[3]

Under a reasonable, plain reading of either word, none of the statements Klioner made to induce the sale of the condominium qualify as "promises" or "guarantees." The statements predicted future happenings (the crash of the market, the drop in value of the condo, the inability to sell in the future, the loss of

---

[3] Some definitions of "promise" and "guarantee" overlap. *E.g.*, *promise*, OXFORD ENGLISH DICTIONARY (last visited Feb. 7, 2024) https://www.oed.com/dictionary/promise_n?tab=meaning_and_use#28177403 [https://perma.cc/JN33-ZNB2] (defining "promise" as "guaranteeing that a specified thing will or will not happen."). But under Florida law, we must "give meaning to each and every word" in a contract. *Equity Lifestyle Properties, Inc. v. Fla. Mowing and Landscape Serv., Inc.*, 556 F.3d 1232, 1242 (11th Cir. 2009). So to the extent possible, we avoid treating "promise" and "guarantee" as redundant of each other, giving each word an independent meaning. *Id.* Read distinctly, a "promise" involves the assurance to act to bring about a condition or to be responsible for that condition; but a "guarantee," under at least one reasonable interpretation, is the assurance that an obligation will be triggered if (and only if) a condition occurs. In other words, one reasonable way of distinguishing between "promises" and "guarantees" is that "guarantees" are conditional, but "promises" are not.

Heliac's money), but they did not bind or commit Klioner or One Sotheby's to performance or forbearance of a specific act.

Klioner did not promise to sell the condominium at a specific price; he merely predicted that Heliac would lose money in the future, which required no action or obligation on his part. He also did not promise to forbear from selling the condominium in the future; rather, Klioner stated that the market—not Klioner—would prevent Heliac from selling the unit. Nor did Klioner suggest that he or One Sotheby's would become responsible for the effects of the happenings he predicted. He did not promise to continue working with Heliac even if the market dropped, or guarantee that Heliac would make more on a sale at the time of his statements than it would have in several months, or Klioner or One Sotheby's would cover the difference. These statements were predictions of future value, and they may or may not have been "material" in terms of how they affected Heliac's behavior. But Klioner did not commit to performing or taking on an obligation related to these predictions, so they were not "promises" or "guarantees." As a result, the future-value exclusion does not apply and does not relieve General Star of its duty to defend.

### III.

For the foregoing reasons, we affirm the district court's orders granting One Sotheby's motion for judgment on the pleadings and denying General Star's motion for summary judgment.

**AFFIRMED**.